May I please the Court? My name is Kristen Boyles, and I represent the Appellant's Oregon Natural Resources Counsel in this case. With me at counsel table is Amy Williams-Derry, and I would like to save two minutes of my time for rebuttal. I have two issues to discuss this morning, Your Honors. The biological opinions analysis of the destruction of critical owl habitat and the failings of the incidental take statement. I'd like to turn to the first issue. The Fish and Wildlife Service designated critical habitat for the northern spotted owl in 1992, protecting areas that the service found essential for survival and recovery of that species. And the service found- I have a question. It seems to me there's a threshold issue, and that is whether the prior case of the Ninth Circuit, the Gifford case, controls this case and therefore disposes of some of the issues. Your Honor, the Gifford-Pinchot Task Force case controls on at least one of the claims that we have brought, and that is the claim that this biological opinion fails, is invalid, because it considers other forest designations under the Northwest Forest Plan when it is critical habitat analysis. That's at the Gifford-Pinchot case at 1075-76, and on that issue it controls entirely. What about the holding on Gifford-Pinchot that the regulation under which the service acted is invalid? If that's so, isn't that the end of this case? Your Honor, we're in an interesting position. This biological opinion is of the same era as the biological opinions reviewed in that court, and it relies on the same regulation that the Gifford-Pinchot court found was invalid as applied to those biological opinions. We did not raise an as-applied challenge to that regulation, and our challenges rest primarily on the plain language of the statute, not the regulation, and where they do talk about the regulation on a different portion of the regulation, the adverse modification portion, not the survival and the recovery prong. Now, having read Gifford-Pinchot and looking at our biological opinion, I would say there are probably very similar issues, but at the time that was not what this case focused on, and so we are in a situation where the regulation has been held invalid as applied. We have not raised that challenge, and our issues do not necessarily require that regulation to be in play in order for this court to rule on them. In that situation, it's an interesting situation because it is, in fact, an invalid regulation now according to this court, but they did do a harmless error test, which we wouldn't have here because we haven't been briefing that issue. On the issue, however, of whether or not the service can correctly look at the land designations in the Northwest. Excuse me, but staying with that for a moment, if we take, if we affirm this case, assume that, not agree with it, but assume that, don't we then have two decisions involving much of the same issues, much of the same areas, and one case relying on an invalid regulation? Isn't that a little inconsistent to let that go ahead? I think that would be inconsistent, Your Honor, especially on the one issue which clearly controls, which is on whether or not the service could look at the land designations under the Northwest Forest Plan for its critical, in place of its critical habitat analysis. With respect to the other issues, we have an incidental take statement claim which is not raised or addressed at all in Gifford-Pinchot. We do not raise similar claims about owl tracking, so those issues are not around, but there is the fundamental issue of the regulation being invalid. Again, our argument is based on the plain language of the statute more than the regulation, but if this court feels that the invalidity of that regulation causes the issue to be resolved already, we certainly would not disagree with that. Would that resolve it? In other words, if we, in our infinite wisdom, were to say that the Gifford-Pinchot case did control, is there anything that left to be done? It has to go back. The agencies have to go back to square one and start over. Wouldn't that moot the rest of the case? That would moot the issues in this case, Your Honor, except I would submit on the incidental take statement claim, which is a separate claim. Well, if they went back and, you know, suppose if they started over, if they wouldn't look at the incidental take statement all over again, I wouldn't imagine that they would just leave that out there, you know, unamended. I would hope not, Your Honor, because I think the incidental take statement is seriously flawed, however, and so they might. That might resolve the entire issue. I think this issue has been raised in many different biological opinions, and so it is one that is ripe and available for the Court's adjudication. Regardless of the ruling on the regulation? Regardless of the ruling on the regulation, Your Honor. To come back to Gifford-Pinchot, does it really matter whether you raise that issue in this case if Gifford-Pinchot is a precedent in the circuit on the issue of invalidity of the regulation? The regulation applies, does it not? That is, it controls what the service did here. Aren't we bound by that precedent as a matter of law? Yes, Your Honor, I believe you are. I mean, I'm in the awkward situation of wanting you to be bound by the precedent in Gifford-Pinchot, but having not raised it and argued it in my case, so I believe you are. It's a later decision that comes along, like a 28-J type of thing, which is what you did. Yes, Your Honor. Yes, Your Honor. We do not require the gift of foresight in order to practice in the Court, so the fact that you didn't raise it really can't be held against you, I don't think. Your Honor, there are many different reasons we didn't raise the claim, because we primarily focus on the ones we have in front of you. I take it that if, again, that we were to accept the ruling in Gifford-Pinchot and send it back on that basis, that you would be standing on the sidelines lobbing hand grenades at their incidental take analysis if they started to do that again. That is correct, Your Honor, and in all subsequent biological opinions which have the same flaw. If we did remand it, could we not remand it with instructions to reconsider the incidental take disposition? I believe you could, Your Honor, yes. As I've said, that one of the failings is the failing directly addressed in Gifford-Pinchot, which is the reliance on the late successional reserve designations under the Northwest Forest Plan. There are two others which we have discussed in our briefs. The most important and one to understand that underlies sort of everything here is the failure of this biological opinion to look at specific sales, that the sales at issue here are hypothetical, they are not fixed in location, and that means that you do not have the site-specific analysis that is necessary to be able to understand whether or not you've actually adversely modified critical habitat. And let's be very clear, this is a peculiar biological opinion. This biological opinion allows the destruction of over 10,000 acres of designated critical habitat. So the question of are we adversely modifying critical habitat at first glance seems obvious. It's being cut down, but then there is the need for the service to look at the site-specific impacts of that, and that is what's missing here. The Northwest Forest Plan itself was very clear about the need to look at the site-specific impacts for endangered species consultation purposes. Does Gifford-Pinchot reject that approach that says it's not required to look at site-specific impacts? No, Your Honor. That issue was not in front of the court at Gifford-Pinchot. The court in Gifford-Pinchot is looking at how they can do a jeopardy analysis with respect to the owls and looking at habitat as a proxy. But there was not an issue in front of the court about whether or not the site-specific nature of the sales needs to be addressed. And the service is very... So your argument is that the service did not follow its own procedures that were set out in the Forest Plan? Is that your argument? It's that and more, Your Honor. The Forest Plan itself says it's important to take a site-specific look at all the impacts to critical habitat because critical habitat and the Forest Plan are supposed to work together to protect the owl. And so that's the first place. The second place comes from sort of an idea of how we're going to look at impacts on the ground at all. How are you going to consider cumulative effects? How are you going to consider concentration of effects if you don't look at particular sales in particular places? And what authority are you relying upon for the broader statement you've made? For the broader statement, I looked at two places. The statute itself, which talks about the plain language saying that the service cannot approve something which is adverse modification or destruction of critical habitat. And so you extrapolate that to mean site-specific? I do and I do with the help of this Court's opinion in Pacific Coast Federation Association versus National Marine Fisheries Service, which dealt with a similar biological opinion which looked at sales over a large, large spatial scale, the scale of a watershed, and found that when you look that large, you miss the aggregate, you miss the tiny, the smaller impacts from site-specific projects using that exact language. And in fact, in that case, the sales were even identified. Here we don't even have identified sales. We have sales that can move across the landscape, capped only by watershed limitations, which are hundreds to thousands of acres in size. Does the opinion consider specific critical habitat units that are in the area that's covered by the opinion? It does, Your Honor. One by one. It does, Your Honor. It talks about the specific critical habitat units. And it's important to go look at the biological opinion and see exactly what they do talk about there when they talk. They are still talking at a gross acreage level and not looking particularly at what's going on within those habitat units, which again are thousands of acres in size. The two, let me discuss one that we talk in our brief, that's the critical habitat unit Oregon 75. The biop itself at page 40 identifies this as particularly vulnerable. It's going to lose 9.9% of the existing suitable habitat for the owl. The service says it has looked at the effects, but if you look at the table on page 5, sorry, table 5 at page 30, to which they point, it's just presenting an already degraded baseline. There's no analysis. There's no real look at what's happening on the ground. And this is the last time the service is going to look at these sales. These sales will now go forward. And without the site-specific look, you're going to miss the impacts that you need to see. You're not going to look at the relevant factors identified by the agency itself. And for issues such as dispersal, which the service admits in its biological opinion is as important to the owl as gross acreage, you're not going to get that at all. Because if you have 1,000 acres to be cut across a watershed in small clumps versus 1,000 acre swath right through an important foraging area, vastly different impacts that you're going to have. I'd like to turn to the incidental take statement if I might. An incidental take statement is given by the service in a biological opinion and allows otherwise prohibited taking, which is to kill or to harm the species at issue for the owls here, to occur. This court has held in Arizona Cattle Growers that an incidental take statement has to contain a trigger that when it's reached shows that the analysis of the service has been perhaps unanticipated, has unanticipated consequences and re-initiation must occur. This way the incidental take statement provides that check upon the judgment of the services about the impacts from a particular project. And it allows a way to stop the project and re-initiate consultation if there are too many protected species being harmed or killed. The easiest way to quantify take is of course to have a number of animals that can be harmed or killed. But that is not the only way. And the service here has insisted that it no longer counts owls. And the case law makes it clear that that is acceptable if there is a proxy or a surrogate that can stand in for the actual number of animals that can be allowed to be taken. This incidental take statement allows the Forest Service to remove all owls, this is the quote, all owls associated with the removal and downgrading of over 22,000 acres of suitable owl habitat. That is the same amount of suitable owl habitat that is planned to be logged. It is not a surrogate for the number of owls that can be taken, it is simply restating the project scope and therefore can't provide an independent check on whether or not... What would be an acceptable surrogate? Your Honor, I think an acceptable surrogate would be something that you could measure outside of the project, such as for owls. And again, I'm not suggesting these as measures, but these are places that the service itself has identified as things to talk about with owls. Percentage of reduced forest cover, number of abandoned owl nest sites, a loss of the prey base, a reduction of the prey base, something to which you could extrapolate. That must mean that there are more owls being harmed or killed than the service anticipated. But when you make it the project itself, you never get to that check. The independent check will never become performed because you will finish the project and the project will be finished. My example that I've been discussing with my colleagues is, if you have decided to run a marathon, but the doctor is afraid for your health, but he thinks you're going to be okay, the doctor doesn't say, stop running when you finish the marathon, because that would provide no check whatsoever on your ability to run the marathon and still be healthy. Instead, the doctor says, stop running when your pulse reaches over 160 beats per minute, or when you feel faint, or some independent check on the wisdom of you finishing the marathon. That's the same thing we need to have here. We need to have that independent check on whether the service has made the right assessment about the ability of the owl population to withstand this kind of take. As opposed to your doctor example, the other owl would be, stop running when you collapse. Stop running when you collapse. It's true, and in this situation, how are we going to know when the owls have collapsed? It's then going to be too late to do anything about and say, we should re-initiate consultation. The whole point is to stop the project, to re-initiate consultation, to take a new look at the impacts. Now that we have the new information that the owl population has collapsed, it will be too late at that point in time. What this incidental take permit does, statement does, is give a second approval for the project, and the Forest Service and BLM don't need a second approval for this project. They have that in the body of the biological opinion. What they need is a trigger to stop the project in case the anticipated impacts are too great, and that trigger they don't have. Your honors, we would ask that you reverse the decision of the district court and declare the challenged biological opinion and its incidental take statement invalid, and I'll save the rest of my time for rebuttal. All right, thank you. Good morning, your honors. I'm Justin Smith for the United States. With me at council table are Diane Hubler and Brendan White of the Fish and Wildlife Service, and I think I'll just launch right into the issue that your honors have raised, which is the effect of the Gifford-Pinchot case. We would emphasize that this, that Gifford-Pinchot, this court should be very careful in treating Gifford-Pinchot as controlling this case for several reasons. First of all, this case has three elements, a critical habitat, a jeopardy, and an incidental take element, and Gifford-Pinchot's holding, the holding that you were discussing, goes only to the critical habitat piece. Jeopardy and incidental take remain, unquestionably remain live issues. I think critical habitat also remains a live issue, and I'll get to that issue. The reason is that the aspects, the provisions of the regulation in question are severable. That is, the court can do a severability analysis on the regulation, and the recovery flaw that the court identified, which is the only flaw that the court identified in Gifford-Pinchot, doesn't necessarily invalidate the other elements of the regulation, most notably the appreciable diminishment standard as applied to survival. The recovery, the pivotal issue here? Well, your honor, this opinion actually contains a thorough discussion of recovery, and let me just refer you to the page numbers in the record.  It's quite thorough, yes, your honor. I mean, if you look at pages 16, 40, 41, 48, 80, 90, 91, and 92, the recovery is discussed there, and the discussion is integrated with the rest of the opinion. The Fish and Wildlife Service, I'm not going to say that the Fish and Wildlife Service saw Gifford-Pinchot coming, but the service was aware that there was a concern after the Sierra Club decision, and began conducting this analysis in its biological opinions, whether or not it was certain it was legally required to do so as a prudential matter, and we believe that the analysis of recovery in this opinion is legally sufficient, and that this court can uphold the opinion's critical habitat analysis on that ground, especially because plaintiffs have just conceded that they never challenged any of those passages that I just cited. In none of their briefs do they raise recovery questions. So, the recovery issue that was central to Gifford-Pinchot is just not in this case, and this court can reach the critical habitat issues that they raise without touching on the recovery problems posed by Gifford-Pinchot. I'd point out, your honors, that if you look at the Gifford-Pinchot opinion itself, part 3b2 of the opinion, goes on to analyze a critical habitat issue, two critical habitat issues, which, under the approach that was discussed, the court should not and could not have reached, because the rest of the opinion was arguably invalid for reliance on this definition. Nevertheless... I'm sorry. Doesn't Gifford-Pinchot invalidate your definition of... Your honor, it invalidates the recovery analysis in the definition. Right. That doesn't necessarily invalidate the rest of the definition, that is, appreciable diminishment as it applies to survival. It's also possible to analyze this opinion under the statutory standard, which remains in place, and which will govern in the Ninth Circuit until the Fish and Wildlife Service promulgates their corrected regulation, which they're going to do, they've said they plan to do. So, isn't it preferable to send it back so the district court can have the guidance of the most recent ruling on the issue? Why would we want to confuse the matter by dealing with this piecemeal? I don't understand the rationale for that. Well, certainly on the recovery issue, it makes sense for the district court to look at that issue first. If the plaintiffs want to raise that in the district court, we agree. It's never been briefed. It's a complicated issue. There's a lot of discussion in this opinion of recovery, and we think the way you analyze recovery, it's a hard question. It's not something this court needs to get to. We think Judge Pana wrote an adequate opinion on the rest of the issues, and this court can certainly, should affirm on the jeopardy and incidental take aspects, and we think should also affirm on the critical habit aspects for the reasons I've been discussing. It is an option for this court to ask the district court judge to take a second look in light of Gifford-Pinchot. That is certainly an option this court has as well. We don't think this court's compelled to do it. Well, isn't Gifford-Pinchot at least authority on the proposition that the service cannot look to the Northwest Forest Plan as to supplement or to deal with the deficiencies in pre-ecology? It is, Your Honor, but once again, this is an issue that the Fish and Wildlife Service saw coming. This is a later biological opinion, and if you look at the analysis of critical habitat on pages 40 and 41, you'll see it analyzes only critical habitat, and when it turns to the Forest Plan land allocations, it does so with phrases like, in addition, or other phrases that indicate it's changing the subject. It's a see-also. It's not direct support. So are you saying then, in reviewing this case, we should disregard any references to the Forest Plan in looking at whether or not the critical habitat requirements are met? Your Honor, that's right. The Forest Plan allocations, I guess, with one exception, that is, the areas of the forest, the areas protected by the Forest Plan, the late successional reserves, are not essential to the critical habitat elements of this opinion, but there's a little bit of a misimpression in the plaintiff's briefs, I think in their reply brief on page 15, they suggest that the riparian reserves and the 15 percent standard are outside of the critical habitat units, and that's not right. Those are provisions that are prohibited from being cut within the critical habitat unit. They're protected areas that no logging can occur there, and they provide, especially So why do you say that in the biological opinion? I, Your Honor, I'm not sure that those terms are defined in the biological opinion, but the biological opinion refers extensively to the Forest Plan categories. Well, but you said we disregard the Forest Plan. You disregard Forest Plan land allocations outside of critical habitat, inside of critical habitat. The fact is, the Forest Plan, it's a vitally important document for conserving the owl, and what it does is, it sets aside these areas of riparian reserve and other areas. The Forest Plan is binding on the action agencies, and the action agencies may not That's confusing me then, because I thought you said, when we're looking at whether or not the critical habitat requirements are met, we disregard the Forest Plan because Guilford Pinchot said that you can't use that as a supplement for your requirements under the Act, right? No, you disregard areas outside of critical habitat, yes. That's what Guilford Pinchot said, but the Forest Plan preserves areas within critical habitat. And what are those? Those are the riparian reserves, which means it's a protected area along a water body, which an owl can migrate along, it's a migratory corridor, and there's a rule that you have to leave 15% of timber standing, old growth timber And how do you know in the biological opinion where that is? How do we know that? It's discussed, pages 40 and 41, specifically discuss, I believe it's critical habitat unit 75, in analyzing dispersal, the opinion says, well, among other things, the owls can disperse along this protected corridor within the critical habitat unit, which is protected by the Forest Plan land allocations. So the Fish and Wildlife Service You have to go back and forth, back and forth to figure all of this out. It doesn't say it anywhere explicitly. No, it's explicit, Your Honor. I mean, that's what it says on pages 40 and 41. It says the riparian reserves are protected areas within the critical habitat unit, and owls can go through the critical habitat unit. Go through? Yes. To where? Well, the analysis, that piece of the analysis is looking at connectivity, so the question is, can the owl populations That's dispersal Dispersal, exactly. It's not recovery, not survival, right? Dispersal is, it goes to both recovery and survival. That is, if the owl can't disperse, it won't survive and it won't recover. The idea of dispersal is, if the owl populations become isolated, then the owl can't breed and the populations shrink and die off, so Are you using dispersal then as an adjunct to recovery and survival or a substitute for recovery and survival? Dispersal is a fundamental goal. It's the way you analyze both recovery and survival. It's a building block. Where is that set forth in Section 7 as one of the requirements for a biological opinion, though? Well, if you look at the critical habitat designation, Your Honor, you'll see that dispersal is discussed in the Federal Register Notice designating the owl's critical habitat. So it varies species by species, of course, Your Honor, but for what the owl needs, it My question is, in the ESA, the emphasis is on recovery and survival, not dispersal. But to analyze recovery and survival, you have to analyze dispersal. There's no other way. That is, pages 40 and 41, looking at critical habitat, they reach a conclusion about survival and recovery at the end. But to get there, they talk about dispersal. If the owl can't disperse, it won't survive or recover. It's essential to both of those goals. I understand. It just seems like you're focusing more on dispersal than on recovery and survival, which is supposed to be the emphasis. That's how it appears to me when you discuss dispersal as the primary focus. The biological opinion does talk about recovery repeatedly, but the idea is it's how you analyze recovery of the owl, is by analyzing dispersal, among other things. That's what the biologists tell me. There are all these studies, and I apologize for the thickness of our supplemental excerpt. There are supposed to be eight factors that you look at, aren't there supposed to be other factors? And where are those discussed? Well, the biological opinion looks specifically at the question of the number of owls affected, for example, in the owl reproductive health. That question is being analyzed by looking specifically at demographic studies, range-wide, very comprehensive demographic studies, which the Gifford-Pinto opinion approved as a methodology for analyzing the owl. In Part 3A of the Gifford-Pinto opinion, the court specifically approved the reliance on those demographic studies and have that data. For those who are not as well-versed in this stuff as you guys are, it would be really helpful if each one of the factors was listed and a discussion ensued. So that way we could check it off and say this factor was included, this factor was included. But looking at the biological opinion globally, I don't see all the factors discussed. If I could point your honor to the actual language of the designation of critical habitat, it's actually not mandatory to discuss each factor. If you look, the next paragraph says must, about what must be discussed. But the paragraph with the eight factors, it's an illustrative list. The question is how do you get at the owl survival and recovery, and these are some of the things you look at in doing that analysis. It's a very long document, and it wasn't purporting to set out a binding framework for rating these opinions, your honor. Before I forget, I have one more concern about this Court assuming that the Gifford-Pinto opinion invalidates this biological opinion. There are a large number of biological opinions in the Ninth Circuit. And if were this Court to reach that conclusion, there could be unanticipated effects, especially because in many of those opinions, the Fish and Wildlife Service… Critical habitat opinions? Some of them may involve critical habitat, yes. That's all we're talking about right now. Yes, exactly. But some of them do involve critical habitat, and the Fish and Wildlife Service may well have discussion of recovery along the lines of what's in this opinion in some of those other opinions. And were this Court to find as a binding matter that the Gifford-Pinto opinion knocks down any opinion that mentions that regulation, the result could be rather… broader than the Court might intend. I just want the Court to know about that potential consequence. If I could turn to the incidental take statement issue. The problem is, we agree with Planoff that it would be nice to have this additional measurement. It's not required legally. If you look at the Arizona Cattle Grower's opinion from this Court, that opinion said that a habitat proxy was appropriate. This habitat proxy has been very specifically tailored to what the owl needs. That is, well, the owl needs old-growth forest and dispersal habitat, and those habitat factors are being measured. Those are proxies for the incidental take? Well, those are proxies for measuring how many owls will be taken, yes, because what the Service does is it has these demographic studies, these surveys, which were discussed in Gifford-Pinto, and it essentially assumes that there will be owls in all of these locations, and guesses, based on these assumptions, it projects what the effect on the owl is going to be. Now, the only way to do… Will the owl be taken? It projects, and that's a very worst-case assumption. In fact, the owls move in response to these activities. We hope they can. We hope. And in many cases, the owls don't move because the owl can actually survive some disturbance to its habitat, a fair amount in some cases, depending on where the owl is located. So the Service makes a worst-case assumption, which is what you see in these incidental take statements. Now, what planners would seem to want is that every time a project is done, that there be a very specific study of the effect of that project. They just want a trigger point. Well, but the problem is that you can't have a trigger point like that without really doing a lot of science on the ground. I mean… Isn't that the point of the incidental take statement, that there will be a trigger point? Well, that statement is nowhere in the Endangered Species Act. It's nowhere in the regulations. It's not in the Arizona cattle growers case. There's a district court case that says that. It said that in some funny circumstances involving a rather badly designed trigger point. What we have here is a very well-designed trigger point, which is tailored to the owl's needs. If, for example, the agency later learns that there's more old-growth forest there than they thought, they have to redesign the project or re-initiate consultation. It's a real constraint, and it's a constraint that genuinely will trigger a second look if you learn something new. So you say under this opinion, if the agency finds later that there's more old-growth forest than they thought there was, then they re-initiate consultation? Or they'll have to redesign. They may have to make their project smaller, or they'll have to do something to make sure that the effects to the owl are what they undertook to do. Isn't the obligation to re-initiate consultation not to amend the project? Well, no. I mean, you can go forward with a smaller project if you don't want to go through it. Consultation's rather burdensome, Your Honor. I don't see how that helps preserve an endangered species to say, well, if you find more forest than we thought. Well, the idea is that we know quite precisely what the effect to the owl is going to be. What the plaintiffs haven't done is cite any scientific evidence of any kind that any of these triggers that they speculate about would really work. And the scientific judgment of the service is that this habitat measurement, which Gifford Pinchot endorsed, is an adequate way of measuring the owl. What they're talking about is something that we're very concerned we'll have to, for example, take all our money that's going into our study programs and put it into what may be a worthless undertaking, which may or may not work on the basis of their speculation. How have incidental take statements been compiled before? What measures have been used before? This is not a new issue. How have they been estimated before the takes? I mean, it really depends on the species, Your Honor. In the case they give a grizzly bear example, it might make sense to count the grizzly bears. They're fairly easy to see. The spotted owl is not a new protected species. This is a long-standing methodology, and the habitat measurement is something that the Fish and Wildlife Service has been working on with the client agencies for a long time. It's knitted in with the science that they've got on the owl. That's why this concept of NERF and dispersal habitat, which is used to write these opinions and to do the consultation. To answer the question, how have the incidental take statements for spotted owls been done before? I believe they're written in habitat terms. The ones that I've seen are written in habitat terms. It's the state of the art, essentially. Ms. Boyles touched on a problem I had when I picked this case up and got lost in all the technical language, and that's not your fault. It's hard for me to see how you can have a meaningful opinion on the impact of projects where you are not site-specific, and isn't that just a wild guess? Well, again, let me refer the court to the Gifford-Pinchot opinion actually approves this methodology in part 3b2 of the opinion. It specifically talks about this methodology, the general habitat-based methodology, and specifically approves it. It's not a wild guess, Your Honor, because we have data. The data that the scientists get is tailored to exactly what the service needs to analyze this particular type of project. So it's CHU-based data, it's data. If you look at the figure 1 in our brief, there's a very complicated color map which looks at owl habitat, and to the extent that a project might have been in the area where there could be a problem, you'll see on page 50 of the excerpt of record that the Fish and Wildlife Service specifically set a restriction so that there'd have to be a second look when they located the project to make sure it wasn't in a really sensitive area. That is, the Fish and Wildlife Service, generally speaking, the owl is actually quite tolerant of modest disturbances. So if you make a worst-case assumption, you know generally where the project's going to be, and you can say, well, this project isn't going to have an unusually disproportionate effect. If the project, based on what you hear from the Forest Service or the BLM, might be in one of these very sensitive areas, then you look harder. And that's why on page 50 there's certain townships and ranges that are called out, and that's why the opinion goes into a lot of detail about these three areas of concern. I think Galesville, Cheney Slate, and Mount Ashland are areas of concern, which is one of these actually emerged in the course of analyzing this data. The biologist said, gee, we've got an owl dispersal problem. That's the big deal for the owl, is dispersal. So they've got the granularity they need for a particular project, and Gifford-Pinto did uphold this methodology, Your Honor. Can I just ask you a sort of simple-minded question? The biological opinion shows that a considerable amount of critical habitat will be destroyed, and that means that owls will be lost, and habitat for owls will be lost. So how are the interests of survival and conservation served then? By dispersal, the ability of owls to move to other places? Is that the basic underlying rationale for this opinion? If you look at page 230 of the excerpt of record, you'll see that when critical habitat was designated, the Fish and Wildlife Service contemplated that there could be some timber cutting in critical habitat. They specifically said that in the excerpt of record. The question is just whether the critical habitat cutting is of such a nature as to really make a qualitative difference, and the conclusion is that this is highly targeted cutting as the Northwest Forest Plan contemplated, and that it won't make that difference. That's the goal of this analysis. Congress has never said, for example, that the ESA contemplates a shutdown of logging in critical habitat, and the goal instead has been to target it and to minimize the diminishment. All right. Thank you, Counsel. Thank you, Your Honors. Ms. Botto? Yes, Your Honors. I have a few points. For the point that opposing counsel has discussed as far as this case being different because on the issue of whether or not late successional reserves and the Northwest Forest Plan were used as a substitute for looking at critical habitat, and counsel says that it does not have the same flaws as identified in GP Task Force, I would respectfully disagree and think that the most important place to look is, of course, the biological opinion itself. I would point you to various pages. Page 26 of the biological opinion talks about late successional reserves. Page 36 does as well. Page 16, there is a discussion of the Northwest Forest Plan in the critical habitat section. Page 49 actually talks about how it will not reduce habitat in late successional reserves, not critical habitat. The actual conclusions of this document, they list two reasons why they decided this program was not likely to destroy or adversely modify critical habitat. The first conclusion is that, quote, the amount of spotted owl habitat removed will not significantly reduce the amount of suitable habitat available in late successional reserves. The second list in reason talks about the redundancy built into the Northwest Forest Plan. This biological opinion, just as the ones in Gifford Pitchaw Task Force, rely on the Northwest Forest Plan for saying that the critical habitat destruction does not end up being adverse modification and therefore jeopardy as well to the owl. Second, Judge Rolison, you were asking about the eight factors that the Fish and Wildlife Service has identified. In fact, the eight factors are not discussed in the biological opinion, and if you read it, you will find there aren't in there. It is not that these factors are required or these factors are mandatory or found in some regulation. It's that when the Fish and Wildlife Service itself designated critical habitat, they identified these factors as what needs to be looked at, and now they've gone back on that and instead are relying, as I said previously, on the Northwest Forest Plan. It's not an argument about counting owls. It's an argument about looking at the factors that the service itself has identified as the important thing to look at when you're analyzing the impacts to critical habitat. Turning to the incidental take statement, Judge Schwarzer, you mentioned that this is not a proxy because it allows the take of all owls associated with the project. That is exactly the point. You will never reach a point where you're going to re-initiate consultation here until the project is completed. So what about opposing counsel's position that you don't have to re-initiate consultation, you can just amend the project? I don't think that then performs the function that the incidental take statement is supposed to perform, which is that we need to get to a point where we know if this project has impacts that were unanticipated and not expected by the service and are, in fact, too great. This court in Arizona Cattle Growers talked about how an incidental take statement doesn't operate in a vacuum. It's part of this comprehensive scheme. We are allowing the affirmative killing and harming of owls. We better know whether that's the right amount to do before we allow the project to go forward to completion. If we agree with you, wouldn't we be undermining a lot of biological opinions that were previously issued on this other approach to incidental take? Your Honor, in many other biological opinions, the services, both Fish and Wildlife Service and the National Marine Fisheries Service have come up with proxies which make sense as far as what's the impact on the species. I'm familiar with ones in the realm of salmon where the proxy is, in fact, whether there's an increase in turbidity in the stream or whether there's an increase in temperature. You can come up with a proxy that anticipates what are going to be the impacts on the owl. It cannot be the same as the project scope, though, because then you have to simply skip the step of having a check at all. Finally, Your Honors, GP Task Force cannot be read to address our claims that uncertainty in the location of these timber sales is a problem. That was not an issue in that case. Mr. Smith is talking about the portion of the opinion that talks about analyzing jeopardy, not the actual destruction of critical habitat that's already been designated. Then Mr. Smith says that it's not a problem because we know about these highly targeted timber sales. No. They do not know where these timber sales are in the landscape. There is no site-specific review. The Northwest Forest Plan is specifically the place that said we need rigorous site-specific review whenever we're going to be destroying the already designated critical habitat. Thank you. Thank you, counsel. We will now hear the appeal from American Forest Resource Council. Thank you, Your Honor. I would like to focus my short argument time here on the issue of the adequacy of representation in this case. We believe strongly that the interest that AFRC asserted in these projects that we've been talking about this morning is adequate to justify intervention. If this case goes back to the district court, those projects may be modified. Those timber sales have a combination of critical habitat harvest units and non-critical habitat harvest units. There may be some modification of those. We believe we have an interest that justifies intervention because of that. This is, just for more judicial notice than anything, a map from the California border up to Roseburg, Oregon, showing the area covered by the biological opinion and the checkerboard pattern of the ownership there. The private lands that AFRC members owned are intermingled with the Forest Service and Bureau of Land Management lands. They are concerned with the management that will be going on on these BLM and Forest Service lands and how that might influence their management. Does that mean your intervention enlarges the issues in this case? Because you're talking about management of particular parts. Well, I mean, that's an interesting point that the cases don't seem to be consistent on. But they address the issue. Yes, they address the issue and they address it differently. In one breath they say, well, are you going to enlarge the issues in the case, therefore we don't want you in because we don't want to hear from you. In the other breath they say, well, if you're just going to argue the same thing the government is, why do we want to hear from you? I would submit that ultimately, while the applicant has a burden of demonstrating inadequate representation by existing parties, the burden is minimal under the Supreme Court's Provich decision and the applicant need only show that the representation may be inadequate. And maybe is a key term here because in this particular case, the issue of intervention is a threshold inquiry where we were at the time that the case was filed was that a motion to intervene had been timely filed. The plaintiffs hadn't filed their motion for summary judgment. The government hadn't filed their answer. They filed it simultaneously on the same day as our motion. And therefore, the assessment of the adequacy of representation in this case necessarily needs to focus more on the analysis of the concrete interests rather than an evaluation of the unknown arguments that parties might or might not make. And Rule 24A itself stresses that the importance of the interest in assessing the adequacy of representation in its exact language where it says that intervention of right must be granted unless the applicant's interest is adequately represented by the existing parties. Do you have an interest in the integrity of the biological opinion? Do you have an interest, of course, in the ultimate outcome of what can be done in terms of timber harvest on that land, but do you care about spotted owls and what the opinion says about conservation? And that's where our interests differ and why we should be in the case, particularly if the court is inclined to remand it to the district court and we may be talking about injunctive relief issues. Here we agree that there's a presumption of adequate representation when parties have the same ultimate objective or the government is a party to the case. And AFRC and the Fish and Wildlife Service here do not share the same ultimate objective. Their interests are different and the analysis of the interest is important. In terms of the context of this case, we have to look at what the case is and what the issues are in the case in determining whether or not the interests are the same. But the interest does not have to be the interest specifically under the Endangered Species Act statute. The case law in the Ninth Circuit says you have to have an interest under some statute. Here our interests in the contract are founded in the National Forest Management Act. Okay, so you rely upon to inform your argument regarding the definition of interest for purpose of intervention. A number of cases. Give me your best one. Okay, I would argue that U.S. v. State of Oregon at 839 Fed Second 638 where the court said quote, by defining adequacy in terms of what existing parties are going to argue rather than in terms of the interests of the applicants in the subject matter of the litigation turns Rule 24 on its head. My question then, what is the different interest that you have? I didn't ask you about the different arguments. I asked you what is your different interest in the context of the issues in this case? Right, and there's three interests that differ from the Fish and Wildlife Service. Much like in the bird case where the developers in San Diego, they arguably shared the same ultimate objective in upholding the biological opinion. But the court in trying to address that presumption and to determine whether there was adequacy of representation referred back to the interests. Our interests here are in the contracts and the projects that the parties have been discussing. They are in the land right next door to these projects where we have planted trees and thin trees and want to maintain the health of those trees and want to see the overgrown forest next to it managed well also. We discussed that in the affidavit of Tom Parton which we submitted with the district court and is in the record. The third interest that is different than the Fish and Wildlife Service, we don't want to be prosecuted by plaintiffs or other environmental groups for violating the ESA and the prohibition in section 9 against take or harm to owls if this opinion is invalidated. Then they say, well, in 2004 you've been harvesting those trees and you shouldn't have done that and you hurt the owl and that's a violation subject to civil and criminal penalties under the ESA. If this case were about permits to cut timber, you certainly would have an interest. That's downstream. That's a long way downstream. No, Your Honor. It's about the validity of an opinion that permits an action to go ahead. With all due respect, Your Honor, these biological opinions at the time this case were filed are living, breathing documents that are tied directly to these projects. They were sold timber sales that AFRC members had purchased and were operating and continue to operate that are affected by that biological opinion. We don't believe that the link could be any closer. If there's a link between the two, then the government adequately represents that interest that they're already bound together. No, the Fish and Wildlife Service in this case, unlike the Land Management Agency, the Fish and Wildlife Service, which is not a defendant here, or the Forest Service, which is not a defendant here, the Fish and Wildlife Service does not hold these contracts. They do not own the land. The BLM owns the land. The Fish and Wildlife Service is the government agency least likely to represent AFRC's member's contract interest in these projects. In the Bird case and in other cases, the court has recognized that when you have an action to basically affect a contract, that the contract holder has a right to intervene, and that's what we would argue here. Because that interest is slightly different than the government, that shows that the government doesn't adequately represent it. I don't see how your interest is different. If this were the classic case where the government might enter into a settlement with the other party that might adversely affect your interest, you'd have a right to be in there because that's an interest that you protect. But in this case, either the biological opinion is upheld or it's not upheld, and if it's not upheld, they'll have to come up with another one, but I don't see how that affects you. It affects us. There's not going to be a settlement in this case, you're absolutely right, but what happens is there will be, following a remand, arguably some injunctive relief issues. These projects are live projects, we're working on those, they're important to the mills in get swept away in their entirety. That has one effect and affects our interest in one regard. If they scalpel-y take out the critical habitat units, that has a different effect. We would like to be able to have a say-so in those issues, and admittedly, to this point, the case has not addressed those issues, but again, the Supreme Court said that your interest may be affected, and in this case, it looks like the way the panel's headed, that it will be affected, and we would respectfully request, in summing up here, your honors, if you were to remand back to the district court, that you do so with leave for us to renew our motion to intervene based on the facts and the opinion of the court. Just one more question. How does an injunction enter into this case? Is there a party in this case that would be subject to an injunction? The District Wildlife Service isn't involved in the cutting of timber or in the project. That's correct, your honor, and we agree 100% with your analysis and would hope that maybe you identify that if you do remand the case, however, there are other district courts who have not viewed it that way. I don't know how plaintiff in this case would view an injunction. Thank you. Thank you, counsel. Any response? Thank you to all counsel. The case that's argued is submitted for a decision by the court, and that completes our calendar for today. The court's in recess. All rise. The court for this session stands adjourned.
judges: T.G. Nelson, Rawlinson, Pollak